**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

MARCUS LAGMANSON, ANTHONY R. REYES,
BRIAN BELDERRAIN
individually and on behalf of all
others similarly situated,                                            No.

                Plaintiffs,

                                      **JURY TRIAL DEMANDED**

v.

ROBINHOOD MARKETS, INC.,
ROBINHOOD FINANCIAL, LLC.,
ROBINHOOD SECURITIES, LLC.,
TD AMERITRADE, INC.,
E*TRADE FINANCIAL CORP.,

                Defendants.

**CLASS ACTION COMPLAINT**

      Plaintiffs MARCUS LAGMANSON, ANTHONY R REYES and BRIAN BELDERRAIN, individually and on behalf of all similarly situated individuals complains of ROBINHOOD MARKETS, INC., ROBINHOOD FINANCIAL, LLC, and ROBINHOOD SECURITIES, LLC, TD AMERITRADE, INC., and E*TRADE FINANCIAL CORP, stating as follows:

**INTRODUCTION**

1.      This is a class action lawsuit premised upon illegal positions that Defendants took that

blocked their customers from placing certain trades, in violation of the law, and Defendants' terms

of service. Plaintiffs are individual traders on the TD Ameritrade and E*Trade platforms who were

impacted when dominant market players, including Robinhood (and its subsidiaries), TD

Ameritrade, and E*Trade, abruptly halted purchasing of certain stocks, causing those stocks to lose

value, damaging Plaintiffs.

## PARTIES

2.     Plaintiff Marcus Lagmanson is an individual residing in Texas.  Plaintiff trades stocks and options through TD Ameritrade and incurred loses in excess of $1.6 million.

3.     Plaintiff Anthony R. Reyes is an individual residing in the Northern District of Illinois. Plaintiff trades stocks and options through TD Ameritrade and incurred losses in excess of $27,000.

4.     Plaintiff Brian Belderrain is an individual and resident of Montana. Plaintiff trades stocks and options through E*Trade and incurred several thousands of dollars in losses.

5.     Defendant Robinhood Markets, Inc., is a  financial services company located in California. It is a FINRA regulated broker-dealer registered with the SEC.

6.     Defendant Robinhood Financial, LLC, is a subsidiary of Robinhood Markets, and acts as a broker for trades made on the Robinhood App.

7.     Defendant Robinhood Securities, LLC, is a subsidiary of Robinhood Markets, and acts as a clearing house for trades made on the Robinhood App.

8.     Defendant TD Ameritrade Inc. is a registered brokerage and registered investment advisor that is listed on the NASDAQ under the ticker symbol, AMTD.

9.     Defendant E*Trade Financial Corporation is a subsidiary of Morgan Stanley and is a registered brokerage.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. § 1331.

11.     Venue is proper pursuant to 28 U.S.C. § 1391 because a lead plaintiff resides in the Northern District of Illinois, and because a substantial part of the events leading to Defendants' liability in this matter occurred in the Northern District of Illinois and Defendants transact business in this District.

## FACTS COMMON TO ALL COUNTS

12.     For the average customer of Robinhood Markets, the main product offered by Robinhood Markets is the Robinhood App.

13.     The Robinhood App is a program or application that can be installed on smart phones which enables customers to place trades in stocks, options, and cryptocurrency.

14.     One of its selling points is that it does not charge any fees per trade – a claim that is partially false, leading to a December 17, 2020 settlement with the Securities Exchange Commission (In the Matter of Robinhood Financial, LLC), and a class-action lawsuit brought by customers of Robinhood Markets (Lemon v. Robinhood Financial, LLC, 20 CV 9328, currently pending before the Northern District of California) https://www.sec.gov/litigation/admin/2020/33-10906.pdf

15.     The way Robinhood and many other retail brokerages are able to offer trades ostensibly without charging any fees, is that they place trades through hedge funds that operate as high frequency traders ("HFTs"), sometimes also referred to as market makers.  These hedge funds pay the retail brokerages to see and execute the orders of retail customers.  This is a practice, called payment for market flow, that is rife with conflicts of interest and is banned in several other countries.

16.     The dominant market maker used by Robinhood and TD Ameritrade is Citadel Execution Services, which is associated with Citadel Securities, LLC. Other market makers used by Robinhood include G1X Execution Services, Virtu Americas, LLC, Two Sigma Securities, LLC, and Wolverine Securities, LLC.

17.     Citadel Securities, and other market makers, pay Robinhood a fee for every order executed through the Robinhood App.   Although Robinhood has not always been forthcoming about this fact-payment for order flow is the primary source of revenue for Robinhood.

18.     TD Ameritrade similarly sells its retail customer's order flow to Citadel Securities, LLC.

Virtue Americas LLC, G1 Execution Services and UBS Securities, LLC.

https://www.tdameritrade.com/retail-en_us/resources/pdf/AMTD2054.pdf

19.     E*Trade Financial Corporation sells its order flow primarily to Virtu Americas, LLC, G1X

Execution Services, LLC and Citadel. http://public.s3.com/rule606/etrs/606-ETRS-2020Q4.pdf

20.     The way that market makers like Citadel profit from these trades is by bundling retail orders

– including orders offered through the Robinhood App and TD Ameritrade – and essentially front

running them. They can also arbitrage the spreads between orders through the use of trading

algorithms that allow them to place orders faster than other traders.

21.     Another way that market makers can make money is to trade against retail orders, which they

are able to do in part because of the massive amount of information they obtain by being third-

parties between retail trading platforms like the Robinhood App or TD Ameritrade and the market.

Historically, trading against customer orders or before them based upon information they contained,

was considered illegal front-running and trading ahead.  In some other contexts, it still is considered

illegal.

22.     Part of what that means is that market makers profit, in effect, by betting against Robinhood

and TD Ameritrade's customers – which they are able to do precisely because they are the third-

parties through which these customers reach the market.

23.     The matters relevant to this Complaint began in early January, 2021. At that time, GameStop

($GME) was trading at around $18. The company's total worth was around $2 billion at that time.

24.     At that point, commenters on a subreddit (that is, an internet forum that could be reached

through reddit.com) frequently used by retail traders, r/wallstreetbets (that is,

reddit.com/r/wallstreetbets), noticed that Melvin Capital, a hedge fund, was shorting GameStop.

25.    To short a stock means to borrow the stock from a broker and sell it – creating a right of repayment to the broker. A trader or hedge fund profits from a short if the price of the stock drops, because the trader holding the short position must return the stock to the broker, and profits from the difference between the original price and the new price of the stock.

26.    Of course, shorting a stock has some risk: if a hedge fund takes a short position on a stock which rises in price, the hedge fund will be required to pay back the difference when it "returns" the borrowed stock.

27.    Some commenters (also called Redditors) on r/wallstreetbets pointed out that when a large hedge fund severely shorts a stock, they effectively state to the world that they want the stock to lose value, which frequently becomes a self-fulfilling prophecy. That is to say, these Redditors stated that they believed Melvin Capital was attempting to force GameStop's stocks down, effectively manipulating the market to cause GameStop to lose money for its own financial gain.

28.    These Redditors convinced enough of their fellows to buy stock in GameStop, to counteract the market manipulation, that its price began to rise meteorically.

29.    By the end of January, 2021, $GME had risen to over $350 per share. To put that in perspective, a retail trader purchasing $50,000 of $GME when it was trading at $18, who sold his stock at its height could make almost $1,000,000 (and some retail traders did just that).

30.    Naturally, this meant that those holding short positions in the stock, lost quite a bit of money. For example, Melvin Capital lost so much money on its short position that other hedge funds, Citadel among them, had to pour $3 billion into it in order to keep it afloat amid rumors that it would be forced to declare bankruptcy.  Citadel's bailing out of Melvin Capital gave it a vested interest that conflicted with the movement of the free market.  The free market was clearly harming Melvin Capital.  If the primary source of revenue for Robinhood and Ameritrade's retail brokerage business wanted to exert leverage on them to turn the spigot off on trading that was harming some

of the largest institutional traders, this would have been rational- leaving aside the ethical and legal considerations.

31.     The media stories about GameStop became so prolific that several other stocks began to be targeted by retail investors. These included AMC Entertainment ($AMC), Blackberry ($BB), Bed Bath and Beyond ($BBBY) and Nokia ($NOK).

32.     Plaintiffs include retail traders who attempted to place trades in GameStop, AMC, Blackberry, Bed Bath and Beyond, and Nokia the TD Ameritrade and E*Trade platforms on January 28, 2021.

33.     On January 28, 2021, Plaintiffs were blocked from purchasing stocks in Gamestop, AMC, Bed Bath and Beyond, Nokia, and other stocks.

34.     On January 28, 2021, TD Ameritrade also blocked the Plaintiffs from making transactions in Gamestop, AMC and other stocks.  They also made it impossible to place orders leaving retails customers trapped in positions or having their pending orders executed at the worst possible price execution, after being unable to operate the online trading platforms or place orders otherwise.

https://twitter.com/whatdotcd/status/1354464851569954821/photo/1

35.     E*Trade, as well, halted trading in GameStop and AMC.

36.     There was no trading exchange that called for a halt in any of these stocks.  Nor did any regulator ask for a halt in trading of any of these securities.  The decision to halt trading on 13 stocks was made in concert by the retail brokerages on their initiative.

37.     But the trading restrictions instituted by the cabal of brokerages did not prohibit the selling of stocks in these companies, only their purchase.  Options positions and trading were also controlled to maximize downward pressure on the aforementioned stocks.  The halt in trading was not a general halt but a halt against trading that would exert any upward pressure on the market in

these 13 stocks. In effect, these brokerage decided to put their thumbs on the scale and control price market in the direction they wanted.

38. If enough customers begin to sell stocks in a given company, that causes the price of the stock to go down.

39 As a result of Robinhood, TD Ameritrade. and E*Trade blocking the purchase of these stocks, they began to lose value. By the close of trading on Thursday, January 28, 2021, the value of these stocks moved down precipitously.

40. Price movements that resulted during the halt of trading in one direction, were the irregular price movements reflective of markets that have been subject to illegal manipulation. For example GME went from $469.42 to $132 within 2 hours of the halt of buying activity.

41. Defendants, and possibly other interested parties like Citadel worked together to put their thumb on the scale as it were. Citadel and other hedge fund investors had powerful interests that conflicted with the movement of the free market. The Defendants used their combined market power to stop a substantial part of the free market from operating as such. Ultimately they succeeded and were able to manipulate price.

41. The parties that benefit from this action are, of course, hedge funds and other non-retail traders who benefit from being able to take positions against retail investors. Larger institutional market participants were not halted from continuing to trade, or in fact increasing their short positions while the retail investors were being kept at bay by the brokerages.

42. Robinhood, TD Ameritrade and others, used their combined market power to possibly enrich their own interests at the expense of other market participants, including retail investors.

43. Beneficiaries include hedge funds like Citadel that profit by taking positions against retail traders like Robinhood, TD Ameritrade, and others' ostensible customers.

44.     The Securities and Exchange Commission has announced an investigation of Robinhood and the brokerages.   https://www.sec.gov/news/public-statement/joint-statement-market-volatility-2021-01-29

## CLASS ACTION ALLEGATIONS

45.     Plaintiffs bring this claim on behalf of all customers who were unable to execute trades of GameStop, AMC, Bed Back & Beyond, Nokia, and other stocks, and on behalf of traders whose positions in those stocks were impacted by the market manipulation caused by the Defendants' restrictions on purchases of those stocks.

46.     This action may be maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure because it meets the requirements of Rule 23(a)(1-4), namely numerosity, commonality, typicality, and adequacy requirements, and it satisfies the requirements of Rule 23(b)(3) in that the predominance and superiority requirements are met.

47.     The class is so numerous that individual joinder of all members is impracticable.

48.     There are questions of fact and law that are common to the named plaintiffs and all other members of the class. These issues include whether plaintiffs were illegally prevented from trading stocks, whether the acts of Robinhood constituted market manipulation, whether Robinhood is leveraging a monopoly on the retail market to force down stock prices to the benefit of well-leveraged hedge finds and the detriment of retail customers.

49.     Plaintiffs have claims that are typical of the claims of all members of the class in that Plaintiffs' claims arise out of the same acts and course of business employed by the Robinhood App on January 28, 2021.

50.     Adequacy of Representation. Plaintiffs will fairly and adequately represent the interests of the members of the class. Plaintiffs do not have claims that are unique to them, and the potential

defenses to their claims are not unique to them either. Plaintiffs have hired competent counsel, including experienced federal litigators who have been involved in class action securities complaints.

51. Common questions of law and fact predominate over questions affecting only individual class members. The only individual issues likely to arise are the exact extent of the damages recovered by each class member which would not bar certification.

52. A class action would be superior to all other feasible alternatives for the resolution of this matter. Individual litigation of multiple cases would be highly ineffective, and would waste the resources of the courts and the parties.

53. The case is also well suited for treatment as a class action and can effectively be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented on a class-wide basis, while the allocation and distribution of damages to Class members would largely be a ministerial function.

54. Defendants have acted similarly with respect to the entire class by uniformly subjecting Plaintiffs and the class to the course of business described here.

**Count I – Securities Exchange Act of 1934**
**15 U.S.C. § 78k(b)**

55. Section 10(b) of the Securities Exchange Act of 1934, codified as 15 U.S.C. § 78k(b) states that:

> *It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange… [to] use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement… any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.*

56.     Defendants engaged in manipulative acts by conspiring to prevent customers from buying certain stocks while still allowing the stocks to be sold, practically forcing Plaintiffs to leave their positions at a loss (which, in turn, caused the stocks to go down even more). This act set the stage for those stocks to fall precipitously in price.

57.     Plaintiffs were damaged in three ways: a.) they were unable to take positions in stocks as they were in the midst of meteoric rises; b) they were unable to cover or exit existing positions; and c) Defendants caused an artificial price and manipulated the market, causing Plaintiffs to lose money inasmuch as they already held positions in said stocks.

58.     Plaintiffs relied upon Defendants to be, as they advertised, a trading platform for retail traders that leveled the playing field against better leveraged hedge funds. In reality, Defendants' actual customers were highly leveraged hedge funds. Retail traders were, in reality, the product, not the customers.

59.     Defendants acted with scienter inasmuch as they acted in the best interests of the market makers that pay it as opposed to the retail traders who make up its ostensible customer base. There was no reason to act as Defendants did other than to benefit large hedge funds.

60.     The entire scheme was part of Defendants business, which is the sale of securities. The scheme took place across national securities exchanges.

### Count II – Sherman Antitrust Violations
### 15 U.S.C. §§ 1 and 2

61.     Defendants' contract with major market makers, like Citadel, constitutes a restraint of trade inasmuch as – as demonstrated here – it led to a large share of the market being unable to purchase stock in GameStop, AMC, Bed Bath and Beyond, Nokia, and other stocks, in violation of 15 U.S.C. .§ 1.

62.     Defendants also possess a dominant market position as demonstrated by the fact that when they forbade purchase of certain stocks, those stocks immediately suffered large losses, in violation of 15 U.S.C. § 2.

63.     As a result of the market positions taken by Defendants, through their monopolistic positions in the market, Plaintiffs here suffered damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs on his own behalf and all similarly situated customers of Defendants, or those impacted by Defendants' market manipulations, respectfully demand judgment against Defendants for:

(a)     Damages as set forth above, plus all other relief as the Court may deem appropriate;

(b)     That the Court certify this lawsuit as a class action under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be designated as class representatives and that Plaintiffs' counsel be appointed as Class counsel;

(c)     That the Court award Plaintiffs and the Class damages against Defendants, including treble damages for their violations of the Sherman Antitrust Act, and appropriate damages for market manipulation;

(d)     That the Court award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees and expenses, including expert fees, as provided by law;

(e)     That the Court award Plaintiffs and the Class prejudgment interest at the maximum rate allowable by law; and

(f)     Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all

issues triable by a jury.

Dated: January 29, 2021

Chicago, Illinois

Respectfully submitted,
/s/ R Tamara de Silva
R Tamara de Silva      (lead counsel)
Law Offices of R Tamara de Silva, LLC
980 N Michigan Avenue, Suite 1400
Chicago, IL 60611
Tel: (312) 913 - 9999
Email: tamara@desilvalawoffices.com

/s/ Jonathan Lubin
Jonathan Lubin
8800 Bronx Ave., Suite 100H
Skokie, IL 60077
Tel: (773) 954-2608
Email: jonathan@lubinlegal.com

*Counsel for Plaintiffs*
